**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

THE GOOD BUSINESS CORP.,

    Plaintiff,

         v.                                **Civil No. 11-1521 (SEC)**

MARKEL AMERICAN INSURANCE
COMPANY,

    Defendant.

MARKEL AMERICAN INSURANCE
COMPANY,

    Plaintiff,                            **Civil No. 11-1532 (SEC)**

         v.

THE GOOD BUSINESS CORP.,

    Defendant.

**OPINION AND ORDER**

Before the Court are the defendant's motion for summary judgment (Docket # 24), the plaintiff's opposition thereto (Docket # 33), and the defendant's reply (Docket # 43). After reviewing the filings and the applicable law, the defendant's motion is **DENIED**.

**Factual and Procedural Background**

The Good Business Corp. ("GBC"), the plaintiff, brings this admiralty suit against the defendant, Markel American Insurance Company ("Markel"), seeking damages resulting from the grounding of a vessel insured by Markel. The material, uncontested facts presented to the Court follow.

In December 2009, Seamus McHugh, president and sole shareholder of GBC, acquired the M/V BRAVISSIMA (the "Bravissima"), a thirty-five-foot Contender-brand boat. McHugh had operated motor-powered boats since 1993—though not in a regular basis. Docket # 34-1, Exh. 5, ¶ 18. He had "been on [the Bravissima] probably six times." Id., 33:3-4. Such minimal use, McHugh explained, was a consequence of the Bravissima's constant mechanical breakdowns, such as engine and radio malfunctions. Id., 33:5-7.

While McHugh could "probably navigate" the Bravissima, as he had studied informally and had taken boating lessons with friends, "he [didn't] drive the boat [him]self," because it was a "stressful experience." Docket # 25-5, 49:4-7; 47:11-12. Accordingly, he preferred to have an "experienced person" at the wheel. Id. One such experienced person was Wilo,  a "captain" who worked for a local hotel as a ferry operator. Id., p. 46:15-17. During the course of 2010, and because McHugh had intended to consume alcohol, he "tipped" [Wilo] anywhere between $125 or $200" to navigate the Bravissima "on about five or six times to Palomino Island," a small island near the coast of Fajardo, Puerto Rico. Docket # 34, ¶ 9; Docket # 25-4, 31:13-15.

Wilo did not always navigate the Bravissima, however. According to McHugh, he would "use two good friends" to navigate the Bravissima so he "wouldn't have to pay [Wilo]." One of his friends, "Nunie," navigated the Bravissima to the Virgin Islands at least twice. Id., 34:3. On some other unspecified occasions, his friend Richard Christianson took over the wheel. McHugh testified that "he went [in the Bravissima] to the Virgin Islands for Christmas and July

[of 2010], and maybe a couple of times, maybe two times . . . ." Id., 33:1-3. He never used Wilo on his trips to the Virgin Islands.

In the same time frame, McHugh and Carlos Bejar, the owner of a scuba and chartering business, discussed the possibility of renting or chartering the Bravissima to Bejar's customers. As a result, "on or before 2010," Bejar started advertising the Bravissima, along with other boats, on his company's website. Id., ¶ 13; Docket #25-11, 40. The Bravissima advertisement, Bejar testified on his deposition, was merely informative: "the web page leads you to contact [Bejar] to give you a confirmation if that boat is on charter or not . . . ." Docket 34-1, Exh. 7, p. 82:10-13 (emphasis added). In fact, no reservations could be made through the website.

In December 2010, the Bravissima's commercial insurance expired, and Bejar could no longer "charter [it] because it didn't have any proper insurance." Id., p. 78:9-12. Nevertheless, the advertisement remained in the website until at least May 4, 2011. Docket # 25-10. When asked why he never removed the Bravissima advertisement after December 2010, Bejar responded:

> Well, I would say my mistake. I didn't have time to talk to the webmaster I guess, to remove it. I didn't give importance to the fact that we were having a boat in the web page that it was nobody inquired [sic] about that boat, that I should remove it first, I didn't, I didn't have the time to do that, I have to be at a thousand places at the same time, and I didn't pay attention to that, so I didn't notify the webmaster.

Docket 34-1, Exh. 7, 78:18-25. Although a "couple of people" inquired about the Bravissima, it was never chartered. Docket # 34, ¶ 13; Docket # 25-5, 33;11-22. In fact, since purchasing

the Bravissima, GBC neither charted it nor used it for commercial or business endeavors. Docket # 34-1, Exh. 3, ¶ 4.

On April 13, 2011, GBC's insurance broker emailed Markel's general agent to inquire about obtaining commercial insurance. "It would be incidental but it is a risk and I want to present this option," the broker wrote. Docket # 25, ¶ 4. That same day, Markel's agent replied, saying that they had no "market" for commercial insurance. Id., ¶ 5. Markel ultimately issued a non-commercial insurance policy to GBC which provided hull and liability coverage for the Bravissima. The effective dates of the policy were from April 20, 2011 to April 20, 2012.

The policy was embodied in a thirteen-page insuring agreement which included a section entitled "General Conditions." A subsection entitled "Misrepresentation or Fraud" provided as follows:

> All insurance provided by this policy shall be null and void if you, at any time, either intentionally conceal or misrepresent any fact, regardless of materiality, or if you misrepresent or conceal any material fact regardless of intent. No action or inaction by us shall be deemed a waiver of this provision.

Docket # 6-1, p. 5. The policy also provided that "by accepting this policy, you agree that the statements on the Declarations Page and the application are your agreements and representations. This policy is issued in reliance upon the truth of your representations. . . ." Id., p. 1.

As relevant here, the policy included a "Stern Drive & Outboard Yacht Application" (the "Application). The Application asked in pertinent part the following three questions:

1. Will the vessel be chartered to others?

2. Will the vessel be used for commercial purpose?

3. Does the applicant or owner employ a paid crew?

GBC answered "No" to each one of these questions. Id., p. 22. Additionally, the following warning appeared on the Application:"The statements and answers provided herein are warranted by the applicant and owner to be true and correct. If incorrect answers are provided (either by error, or omission or neglect), you will be in breach of this warranty and your policy, if issued, will be void from inception. . . ." Id. (Emphasis in original.)

Two days after the policy went in effect, on April 22, 2011, as the Bravissima was traveling to the British Virgin Islands, it ran hard aground near Stevens Cay in Saint John, U.S. Virgin Islands. GBC later submitted a claim to Markel for $95,000 for the loss of the boat and $3,800 for the costs incurred during salvage operations. Docket # 1, ¶ 11. Markel began an investigation into the circumstances surrounding the accident. And, after concluding that GBC misrepresented or concealed its answers to the three questions cited above, denied the claim.

This suit soon followed. Docket # 1. In it, GBC seeks damages for Markel's failure to honor the policy. Markel, meanwhile, filed a separate action for declaratory relief, see 28 USC § 2201, seeking a declaration that the policy is void ab initio as a result of GBC's misrepresentations or concealment. The Court then consolidated both actions, see Fed. R. Civ. P 42(a)(2), and Markel filed a counterclaim for declaratory relief in the instant case. Docket # 4. Since this action was brought pursuant to this court's admiralty jurisdiction, "[t]here is

[generally] no constitutional right to jury trial for admiralty claims."<u>Concordia Co., Inc.</u> v. <u>Panek</u>, 115 F.3d 67, 70 (1st Cir. 1997) (citation omitted).

In due course, Markel filed the motion for summary judgment now pending, arguing, in essence, that GBC had breached several warranties of the policy. Docket # 24. GBC opposed. Docket # 33.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Ramirez Rodriguez</u> v. <u>Boehringer Ingelheim</u>, 425 F.3d 67, 77 (1st Cir. 2005). In reaching such a determination, the Court may not weigh the evidence. <u>Casas Office Machs., Inc.</u> v. <u>Mita Copystar Am., Inc.</u>, 42 F.3d 668 (1st Cir. 1994). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." <u>Maldonado-Denis</u> v. <u>Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994).

The summary judgment inquiry is grounded in the factual evidence available, since "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323-24 (1986). Once the movant has averred that there is an absence of evidence to support the nonmoving party's

case, the burden shifts to the nonmovant to establish the existence of at least one fact at issue that

is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)

(citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of

either party and, therefore, requires the finder of fact to make 'a choice between the parties'

differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 117 (1st Cir.

2005) (quoting Garside, 895 F.2d at 48). A material fact, in turn, is one that may affect the

outcome of the suit under the governing law. Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746,

748 (1st Cir. 1994).

        At any rate, to defeat summary judgment, the opposing party may not rest on conclusory

allegations, improbable inferences, and unsupported speculation. Hadfield v. McDonough, 407

F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8

(1st Cir. 1990)).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a

genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).

Accordingly, once the party moving for summary judgment has established an absence of

material facts in dispute, and that judgment is proper as a matter of law, the "party opposing

summary judgment must present definite, competent evidence to rebut the motion." Mendez-

Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (quoting Maldonado-Denis, 23 F.3d at

581). "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to

limn a trial-worthy issue . . . . Failure to do so allows the summary judgment engine to operate

at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning

that "the decision to sit idly by and allow the summary judgment proponent to configure the

record is likely to prove fraught with consequence"); Medina-Muñoz, 896 F.2d at 8 (quoting

Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he

evidence illustrating the factual controversy cannot be conjectural or problematic; it must have

substance in the sense that it limns differing versions of the truth which a fact finder must

resolve").

**Applicable Law and Analysis**

Markel's primary contention is that the Insurance Code of Puerto Rico does not control

here, and that GBC's alleged misrepresentations or concealment entitle it to void the policy

pursuant to the doctrine of uberrimae fidei.[1] Markel also argues, alternatively, that, regardless

of the doctrine's applicability, the breach of the warranty of truthfulness contained in the policy

likewise excuses payment. GBC, meanwhile, posits that, because it neither misrepresented nor

concealed anything, "it is immaterial whether the controversy is governed by the Insurance Code

of Puerto Rico or by the doctrine . . . ." Docket # 33, p. 6.

The analysis begins with a threshold determination: did GBC misrepresent or conceal

facts by answering with a "No" to the questions contained in the Application. Only if so, will the

Court turn to the effect and consequences of the insured's breach, see Lloyd's of London v.

---

[1] "Uberrimae fidei" roughly translates to "of the utmost good faith." Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 282 (1st Cir. 2006). Pursuant to this doctrine, the insured is required "to disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which . . . renders the insurance contract voidable by the insurer." Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54-55 (1st Cir. 1995).

Pagan-Sanchez, 539 F.3d 19, 24-25 (1st Cir. 2008), which, given the lack of First Circuit binding precedent as to the applicability of the uberrimae fidei in this circuit, see Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 38 (1st Cir. 2006), might involve a cloudy choice-of-law analysis. See Cent. Int'l Co. v. Kemper Nat'l Ins. Cos., 202 F.3d 372, 373 (1st Cir. 2000). Because, as elucidated below, it cannot be summarily determined that GBC misrepresented or concealed facts, the Court need not delve into the choice-of-law analysis at this time.

*Whether GBC misrepresented or concealed that it employed a paid crew*

As said, the Application included the following question: "Does the applicant or owner employ a paid crew"? GBC answered with a categorical "No." But because McHugh allegedly testified in his deposition that he "always" hired Wilo to navigate the Bravissima, Markel alleges, the policy may be voided. Docket # 26, p. 8. While this argument carries considerable force, it is not amenable to disposition via summary judgment.

As a preliminary matter, GBC correctly calls out Markel for incorrectly stating the record by using the categorical "always" to describe Wilo's captaining of the Bravissima. Docket # 33, p. 7. True, during 2010, McHugh hired Wilo "5 or 6 times" to navigate the Bravissima to Palomino Island. Docket # 34-1, Exh. 4, 32:19-20. But McHugh also testified that, in July and in Christmas of 2010, his friend Nunie navigated the Bravissima to the Virgin Islands. Id., 33:1-3. Therefore, McHugh did not "always" hire Wilo to operate the Bravissima. Markel's material misstatement of the evidence of record might suffice to deny summary judgment on this front, see, e.g., T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc., 931 F.2d 816, 829 n. 4

(11th Cir. 1991) (finding that "[a]ttorneys needlessly waste a court's time where they misstate the record"); Dorsch v. L.B. Foster Co., 782 F.2d 1421, 1426 (7th Cir. 1986) (cautioning parties against engaging "misstating the record"). Markel's misstatement of the record left aside, the Court nonetheless reiterates that this controversy is unamenable to disposition via summary judgment.

The crux of the parties' dispute on this front is whether McHugh should have answered affirmatively, given that he had hired Wilo "five of six times." Put another way, the inquiry is circumscribed to whether GBC misrepresented or concealed a fact by answering negatively this question notwithstanding it had hired Wilo "five of six times." This question cannot be answered in a vacuum and must be placed in context, however.

The Court first turns to the ordinary meaning of "misrepresentation" and "concealment." See, e.g., Taniguchi v. Kan Pacific Saipan, Ltd., 132 S.Ct. 1997, 2002 (2012) ("When a term goes undefined . . . we give the term its ordinary meaning." (citing Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995)). A "misrepresentation" means "[t]he act of making a false or misleading assertion about something, usu. with the intent to deceive." Black's Law Dictionary 1091 (9th ed. 2009). In turn, and as particularly relevant here, the Black's Law Dictionary defines "concealment" as "[t]he insured's intentional withholding from the insurer material facts that increase the insurer's risk and that in good faith ought to be disclosed." Id. at 327.

**CIVIL NOS. 11-1521 (SEC) & 11-1532 (SEC)**                                    **Page 11**

As indicated above, McHugh testified that he had "been on [the Bravissima] <u>probably</u> six times." Docket 25-4, 33:3-4 (emphasis added). While he estimates he hired Wilo "five of six times," Docket # 34-1, Exh. 4, 32:19-20, he also says that, on several occasions, his friends Nunie and Christianson navigated the Bravissima to the Virgin Islands. Moreover, Wilo did not navigate the Bravissima the day it ran aground.

This is undoubtedly a close call. On one hand, the record <u>seems</u> to show that Wilo operated the Bravissima more times than Christianson and Nunie. On the other hand, Wilo was never the sole person to navigate the Bravissima. Viewed in the light most favorable to GBC, <u>see</u> <u>Galera</u> v. <u>Johanns</u>, 612 F.3d 8,10 n.2 (1st Cir. 2010), and given the conflicting evidence outlined above, a reasonable person might conclude that Wilo's ad hoc captaining of the Bravissima falls short of qualifying him as an "employed paid crew." Indeed, the evidence of record shows that, in lieu of Wilo, McHugh preferred to have his friends Christianson and Nunie navigate the Bravissima. And in fact, Wilo did not navigate the Bravissima the day of the accident. During the effective dates of the policy, most importantly, McHugh <u>never</u> "hired" Wilo. "Summary judgment cannot be predicated on so vacillatory a record." <u>Montfort-Rodriguez</u> v. <u>Rey-Hernandez</u>, 504 F.3d 221, 229 (1st Cir. 2007) (citation and internal quotation marks omitted).

Of course, a factfinder could reach the opposite determination: that McHugh's previous dealing with Wilo were akin to employing him, thereby misrepresenting this fact. But, whether McHugh should have answered affirmatively this question implicates the "weighing of the

evidence," and a trial—as opposed to summary judgment—is the proper arena to gauge a witnesses' credibility. See Reliance Nat'l Ins. Co. (Europe), Ltd., 246 F. Supp. 2d at 127. In short, the evidence here, "though thin, point[s] in different directions; that is, it tend[s] to support conflicting inferences. . . ." Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 207 (1st Cir. 2006). Drawing all reasonable inferences in GBC's favor, Certain Interested Underwriters at Lloyd's v. Stolberg, 680 F.3d 61, 65 (1st Cir. 2012), and because this determination can go both ways, the Court, at this juncture, declines to resolve this issue. See Montfort-Rodriguez, 504 F.3d at 228.

*Whether GBC misrepresented or concealed that the Bravissima would be charter*ed

Markel has another arrow in its quiver. As stated previously, the Application also contained the following question: "Will the vessel be charted to others"? GBC again answered with a "No." Because the Bravissima was advertised for charter from the beginning of 2010 until at least May 2011, Markel contends, the policy may be voided. Docket # 26, p. 9. For the reasons laid out below, this controversy is likewise not amenable to disposition via summary judgment.

First things first: there is no doubt that the Bravissima online advertisement could give rise to an inference that GBC misrepresented or concealed that the vessel would be chartered. Admittedly, this is Markel's strongest argument, and it depends on Axis Reinsurance Co. v. Henley, No. 4:08cv168-WCS, 2009 WL 3416248 (N.D.Fla. Oct. 22, 2009), in which a Florida district court held that the chartering of a vessel violated an insurance policy limited to recreational use.

**CIVIL NOS. 11-1521 (SEC) & 11-1532 (SEC)**                                   **Page 13**

In <u>Henley</u>, the owner of the vessel established a website to advertise it for fishing expeditions. The website, which was administered by the vessel's owner, showed that it was available for offshore trips at $850 for a full day. In the insurance application, the insurer asked the owner whether he would use the vessel for commercial purposes, and he said no. The vessel was thereupon involved in an accident. As part of the insurer's investigation, the owner admitted to the insurer that the website existed, but that he had only used the vessel for private pleasure, "[a] statement that was false because he had just finished a charter trip." <u>Henley</u>, 2009 WL 3416248, at *14. Then, the owner "[q]uickly tried to delete the [vessel] from the website so that [the insurer] would not detect that it had been advertised for commercial purposes." <u>Id.</u>

As relevant here, the insurer in <u>Henley</u> contended, as Markel does here, that the policy was voided by concealment of a material fact, namely the owner's failure to disclose that the vessel was advertised for offshore charter fishing trips. <u>After holding a bench trial</u>, the district court agreed. <u>Henley</u>, however, is distinguishable from the instant case. For a start, whereas the vessel's owner in <u>Henley</u> had a history of chartering the vessel, the evidence of record here shows that the Bravissima was <u>never</u> chartered. In fact, the vessel in <u>Henley</u> was chartered the day the accident occurred. And while in <u>Henley</u> it was the owner who had created and had managed the website advertising the vessel, in this case it was Bejar who had advertised the Bravissima in his company's website; McHugh had no control whatsoever over the website. Here, moreover, the Bravissima advertisement did not even include a quote, while the website in <u>Henley</u> stated that the vessel was available for offshore trips at $850.

Henley notwithstanding, genuine issues of material fact preclude summary judgment on this controversy. According to Bejar's deposition, for instance, after the expiration of the Bravissima's charter insurance in December 2010, he could no longer "charter [it] because it didn't have any proper insurance." Docket 34-1, Exh. 7, p. 78:9-12. Bejar also testified, as related, that he should have removed the Bravissima advertisement from his website, but mistakenly forgot to instruct his webmaster to that effect. Id., p. 78:18-25. Bejar similarly testified that the website was merely informative: "the web page leads you to contact [Bejar] to give you a confirmation if that boat is on charter or not . . . ." Docket 34-1, Exh. 7, p. 82:10-13 (emphasis added). Under these circumstances, then, a vessel appearing on Bejar's website is not tantamount to it being available for charter; much less proves that McHugh knew about it. This, coupled with the uncontested facts that the Bravissima had never been charted before and after the policy was in effect, constitute factual disputes sufficient to bar summary judgment. See Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 207 (1st Cir. 2006) (concluding that when a court must choose between competing plausible inferences, "'[that] choice cannot be made under the banner of summary judgment'"(quoting In re Varrasso, 37 F.3d 760, 764 (1st Cir. 1994) (alterations in original)).

One last word regarding Henley is in order. The court's holding there came after it held a bench trial in which it weighed conflicting credibility determinations. See Henley, 2009 WL 3416248, at *1. Because a bench trial has not been held here, the Court is impeded from making such factual findings in a motion for summary judgment, cf. Texaco P.R., Inc. v. Dep't of

Consumer Affairs, 60 F.3d 867, 878 n. 5 (1st Cir.1995); see also, e.g., Reliance Nat'l Ins. Co. (Europe), Ltd. v. Hanover, 246 F. Supp. 2d 126, 127 (D. Mass. 2003) (denying summary judgment and holding a bench trial "with the court sitting in admiralty").

Markel demurs, arguing that GBC's assertion that it had no intent to charter the Bravissima because it lacked charter insurance coverage is the "type of improbable inherence" disavowed by the First Circuit. Docket # 43, p. 5 (citing Pagano v. Frank, 983 F.2d 343, 437 (1st Cir. 1993)). But Bejar also stated that he would not charter the Bravissima due to its lack of charter insurance. This distinction is significant (but not dispositive as incorrectly asserted by Markel, see Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 18 (1st Cir. 2007)), because, absent Bejar's testimony, McHugh's statement that he had no intent to charter the Bravissima could arguably be self-serving.

In any event, Pagano does not aid Markel. That case merely recites—but does not apply—the well-known summary judgment standard that "[e]ven when elusive concepts like motive or intent are in play, 'summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Pagano, 983 F.2d at 437 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). As concluded above, the Court already concluded that Bejar and McHugh's testimonies contradicting Markel's contention, together with the irrefragable fact that the Bravissima had never been chartered, constitute more than the "conclusory allegations, improbable inferences, and unsupported speculation," id., disavowed by Pagano. Thus, inasmuch

as Markel's reliance on <u>Pagano</u> is misplaced, it misses the mark on this front. Drawing all inferences in GBC's favor, the Court finds that, under these circumstances, the existence of the online advertisement, without more, is insufficient to summarily conclude that GBC misrepresented or concealed that the Bravissima would be chartered.

Finally, Markel maintains that, because GBC's insurance broker emailed Markel's general agent to inquire about obtaining commercial insurance, GBC sought to charter the Bravissima. But this argument cuts both ways. It is true that such an inquiry seems to show that GBC considered chartering the Bravissima. As indicated above, however, Markel's general agent replied to GBC's insurance broker, explaining that it had no market for commercial insurance. And GBC ultimately opted for the non-charter insurance. In this context, a reasonable fact finder might plausibly infer that, because it had no commercial insurance, McHugh decided to no longer charter the Bravissima, thus answering negatively this question. Any reasonable, cautious person, after all, would abstain from chartering a vessel lacking commercial insurance, lest the policy be voided ab initio. Again, "[s]ummary judgment should [not] be granted if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." <u>Phoenix Savings and Loan</u> v. <u>Aetna Casualty</u>, 381 F.2d 245, 249 (4th Cir. 1967); <u>accord</u> <u>United States</u> v. <u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (*per curiam*).

**Conclusion**

Although this is a close case, the Court, as it must, declines to weigh the evidence via summary judgment. It is in a bench trial, upon deciding whether Bejar and McHugh's

**CIVIL NOS. 11-1521 (SEC) & 11-1532 (SEC)**                    **Page 17**

explanations are credible, that this court will resolve whether GBC misrepresented or concealed facts by answering negatively the Application's questions. For the reasons stated, Markel's motion for summary judgment is **DENIED**

   **IT IS SO ORDERED.**

   In San Juan, Puerto Rico, this 20th day of August, 2012.

                        *s/Salvador E. Casellas*
                        SALVADOR E. CASELLAS
                        U.S. Senior District Judge